Jack Stanislaw, J.
As Suffolk County Commissioner of Health, Dr. George E. Leone brings this action to enjoin the defendant, Joseph Paris, from operating a laundromat owned by him in the Town of Huntington. Paris allegedly is and has been running his business without having fully complied with the Public Health Law and the Suffolk County Sanitary Code.
The defendant’s plan for a waste treatment facility at the laundromat had been presented to and approved by the Health Department, but he never installed it or received a permit to operate. Therefore Paris has engaged in this business without having made any provision whatsoever for the treatment of liquid waste prior to its discharge into the ground. It is the belief of the plaintiff health department that this uncontrolled evacuation of waste containing synthetic detergents will ultimately (if it has not already) adversely affect the purity of drinking water in the county and, more particularly, in the immediate area of the defendant’s operation. Basically and generally, the reason for this would be the scientifically established fact that the waste referred to, synthetic detergent, does not decompose or otherwise break up in flowing and filtering down into and through the soil to the ground waters, the source of the over-all water supply.
Six defenses to this action are raised. These can be summarized as follows: denial of due process and of equal protection, the existence of adequate remedies at law, lack of the real party in interest, and lawful operation by defendant in any event. The case came to trial before this court, and pursuant to 4213 CPLR its decision is here set forth.
One major aspect of the defense to this action is the defendant’s theory that the provisions of the County Sanitary Code to be applied overlap into and have thereby been pre-empted by the Public Health Law of the State of Now York. Attention is drawn to sections of the Public Health Law permitting a hearing by I he Si a it'. Commissioner to persons aggrieved by orders or determinations (§ 1243), the judicial review of such hearings (§ 1244), and proceedings for an injunction to be brought by the Attorney-General at the Commissioner’s request (§ 1251).
New York policy is to “ maintain reasonable standards of the waters of the state consistent with public health ’ ’ (Public Health Law, § 1200). Although discharge of harmful substances into State waters, directly or indirectly, is unlawful (Public Health Law, § 1220), where compliance is impractical due to an absence *444 of adequate methods or simple financial inability, then no injunction will be immediately sought. These problems must first be demonstrated at a public hearing by the person requesting the delay (Public Health Law, § 1224). No mention is made of complete excuse of water treatment, but rather time may be allowed for compliance with health department requirements. At any rate, although permits for construction and operation of disposal systems are to be issued by the Commissioner this duty is explicitly delegable to county health departments (Public Health Law, § 1230, subds. 4, 5). Furthermore, sections 1260 and 1262 of the Public Health Law clearly state the intent of the statute with respect to water pollution control as providing “ additional and cumulative remedies ”, to be construed so as not to repeal any other pollution control laws. It would seem to follow that the Commissioner’s authority to require discontinuance of certain discharges into State waters and to compel compliance with the statute or his orders (Public Health Law, § 1210, subd. 3) does not undermine or undercut that authority which rests with local boards of health.
The Suffolk County Department of Health is a “ local board of health ”, specifically empowered as such to maintain actions “to restrain by injunction violations of its orders and regulations” (Public Health Law, § 308, subd. [f]; §§ 340, 347). It is then abundantly certain that plaintiff not only may bring this civil action but also has available to it the misdemeanor procedures for violations of its orders (Public Health Law, § 348; Suffolk County Sanitary Code, art. I, § 5). There has clearly then been no pre-emption by the State here, and in fact provision has been specifically indicated for co-ordinate and cumulative local action.
Was plaintiff first required to afford Paris a public hearing after notice to him of an alleged violation, pursuant to article 12 of the Public Health Law? At section 5(a) of article I of the county code the Board of Health is granted the power to impose penalties for violations of that code or the State code. These penalties are also sanctioned with relation to orders made pursuant to these codes after a hearing. But the hearings referred to in the county code apply only to violations of orders made in furtherance of the code and not to elementary violations or failures to comply with the code itself. These administrative remedies apparently are not to be circumscribed (see, also, Public Health Law, §§ 348, 1250, 1260, 1262). Therefore, even assuming that article 12 of the Public Health Law has no application here whatsoever, to the exclusion of all other procedures on a county level, the result would be the same. Dr. Leone’s *445 power to maintain this action, without hearings, is proper if necessary to restrain violations of orders and regulations, and the Suffolk County Sanitary Code is one such order or regulation. (Public Health Law, § 347, subd. 1; Matter of Smalls v. White Plains Housing Auth., 34 Misc 2d 949.) The issue finally resolves itself then to a question of whether defendant has violated section 2(c) of article HI of the county code.
Sewage is not to be discharged (into local waters) unless the “ dischargee ’’has been issued a permit to do so (Suffolk County Sanitary Code, art. Ill, § 2[b]) and no facilities are to be constructed for the disposal of waterborne sewage unless such constructions conform to standards approved by the County Health Commissioner or a permit to so construct is issued (§ 2[c]). Construction of facilities is provided for as permissible to the extent of alternative methods of complying with the code. The efficacy of this approach is perhaps limited in that deviations between systems are probable or at least possible. Nevertheless, the undisputed fact remains that Paris did not follow either avenue to the end. He submitted plans which were approved but this facility was never installed, nor was any other. This background makes even more incomprehensible the defendant’s attempt here to deny the existence of any valid standards, properly stated and detailed, and on the other hand to propound the argument that the lack of a permit alone is not grounds for the granting of injunctive relief due to his noncompliance with the code. Paris’ inaction was excusable then no matter how we are to look at it: the insufficient outline of a basis upon which to proceed (that is, lack of standards set by the Commissioner) meant he could go ahead without doing anything, despite submission of plans for approval in the first place. In effect, he embraces the code and then indicates its deficiencies. He simultaneously would also ignore it as not counting for very much of importance.
Plaintiff’s standards are referred to as policy memoranda by defendant, and may be just that. But plaintiff may approve standards, or memoranda, in his capacity as an administrative official and if they are sufficiently detailed they are binding upon those who, as defendant, desire to operate within the sphere of his administrative function. The legal basis for Dr. Leone’s requirements concerning waste disposal is merely the discretionary power vested in him by statute and code. Treatment of waste is not a condition of laundromat operation as Paris seems to believe, but of waste disposal whether emanating from a laundromat or a commercial privy. It cannot be considered a fair statement to suggest that the County Sanitary Code or *446 even one article thereof was enacted and enforced solely to harass laundromat operations. The Board of Health promulgates, adopts and publishes rules, regulations, orders and directions for the security of life and health (Public Health Law, § 347).
Should it be made to appear that plaintiff has available an adequate remedy at law the need for injunctive relief would be obviated. Plaintiff’s regulations are to be considered constitutional if they have a reasonable basis for their existence and are within the scope of plaintiff’s jurisdiction (cf. Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537). To this local Board of Health (and others) the State has legislated the power and duty to act to safeguard life and health in well-defined areas including sanitation generally and, here, waste disposal particularly. Such governmental responsibility is beyond serious doubt at this point in our history (Matter of Gulino Constr. Corp. v. Hilleboe, 8 Misc 2d 853), yet defendant points to a possible distinction in degree rather than in substance. In People ex rel. Bennett v. Laman (277 N. Y. 368) the Court of Appeals approved the injunctive enforcement of a public health type regulation. Although an individual practicing medicine without a permit is not necessarily incapable or a menace to public health, this particular defendant actually was unskilled, incompetent and amateurish, among other things. As in the instant case criminal penalties were available, but there was “no doubt that the criminal nature of an act will not deprive equity of the jurisdiction that would otherwise attach * * * Whether or not the act sought to be enjoined is a crime, is immaterial. Equity does not seek to enjoin it simply because it is a crime; it seeks to protect some proper interest * * * Equity does not pretend to punish the perpetrator for the act; it attempts to protect the right of the party (here the People) seeking relief, and to prevent the performance of the act or acts, which here may injure many.” (People ex rel. Bennett v. Laman, supra, p. 376.) The court pointed out ‘1 that public health, morals, safety and welfare of the community equally required protection from irreparable injury” (p. 378), and that “a court of equity will extend its protection to the health and safety of the public, and, in a proper case, will enjoin acts which imperil that interest and are a public menace ” (p. 380). Obviously, the possibly criminal nature of Paris’ acts will not deter injunctive relief. More importantly, these quoted statements are not restricted' to that which must be categorized a public nuisance, so that Dr. Leone’s failure to prove defendant’s acts as such robs this court of any power to grant the relief sought. If a danger to the *447 public health exists through the continuance of this (or another) defendant’s acts the court will counteract. Cause for relief is presented by proof of tangible peril to the public health by defendant’s conduct or misconduct.
Somehow defendant has equated the real danger element of the Laman case (supra) with a present danger. If there is a substantial threat to the community it need not be hoveringly current. This purported time element criteria for injunctive relief would be self-defeating simply by definition. The indirect, impersonal specter of menace created here, without substance to most at this instant in time, is nevertheless real and escalating, to be stunningly present in due time.
Just how substantial is the actuality of the danger whose present existence is urged by plaintiff? The injunction prayed for must be granted if plaintiff has demonstrated a positive threat of concrete, predictable proportions. This is the heart of the case: proof of danger is cause for concern, its absence cause for personal, though not legal, relief. At the outset it must be noted that Paris, aware of the county code and the alternatives therein set forth with regard to waste disposal (to meet approved standards or to obtain a permit based upon his own plans), nevertheless did not and has not made any provision whatsoever for the treatment of wastes. If there is reason for relief it is clear that mitigating circumstances are nil.
Ground water is the sole source of Suffolk County’s water supply. Ground water can be, and has been, and is still being polluted by laundromat waste discharge moving toward and into it sans natural degradation. When this waste reaches it, the ground water becomes, generally speaking, excessively alkaline and foamy, and it looks, smells and tastes badly. Artificial degradation of wastes prior to or upon discharge has made the control of this situation feasible, although this field is still in a state of flux as newer and cheaper methods are uncovered and research and experimentation continue.
In this case the amount of waste is not insubstantial in volume. Bacteriologically and organically, the contaminated ground water when eventually imbibed is not overly harmful. However, the water supply is surely capable of becoming at least unattractive to the senses and offensive for personal use and consumption. Section 1200 of the Public Health Law enunciates State policy to be, in part, the maintenance of “ reasonable standards of purity”. The defendant caused discharge of untreated waste into the ground and ultimately into the ground water. Although present treatment facilities are being continually improved, the use of any available would have removed *448 detergent contaminants to a point where no discernible trace could be found in the discharged product.
Relaxation of controls cannot be had either simply because the lapse of time between discharge and pollution may be 5, 10 or even 20 years. It was not controverted that synthetic detergent pollution will occur. Despite the unpredictable pollution time household water will eventually become unpalatable. And this is so, too, regardless of the distance the infected discharge must travel to reach the water source. This problem may not be postponed of consideration merely because these participants might be on milk and crackers when the drinking water becomes unpleasant.
The critical point is reached in equating danger to the public health and welfare with water that smells, tastes and looks like a laundry soap solution to some degree. No evidence was adduced as to the physical effect upon the individual of water polluted by untreated laundry waste. Nevertheless, this court readily acknowledges and judicially notes the fact that sanitary engineering in this country, and in this county in particular, has advanced to a point where the public is accustomed to expect nothing short of a strictly uncontaminated water supply. Of course, the probabilities are that one dying of thirst would gratefully, even joyously, accept a glass of what to his senses amounted to a Proctor and G-amble sundae. But by and large we all presumably expect more in the everyday situation both for ourselves and our posterity. A water supply sensuously unchaste appears as a very real intrusion upon public enjoyment and health. Referring again to the same section 1200' of the Public Health Law, what other meaning is there to be ascribed to the policy “ to maintain reasonable standards of purity of the waters of the state consistent with the public health and public enjoyment thereof” (emphasis added)? Untreated disposal of laundry waste is, from all the evidence heard, a danger to this policy, be it legislative fiat only or community expectation as well. Anything less is contrary to both. Unfortunate consequences attach to a most commonly useful, usable and used commodity, making the threat to the public painfully obvious. Parenthetically, it is noted that most of the human body is water, by volume, giving one pause when imagining this volume necessarily being replenished by soap suds.
There are about 112 laundromats in Suffolk County. Some of these do not and have not treated their waste. However, following tests first undertaken in 1957 and 1958 (and still continuing) the Board of Health authorized no more without first insuring their operation provided some treatment of detergent *449 waste. Practically, this policy was put into effect in 1961, although permanent standards were not described until November, 1963. Before then, temporary or flexible standards were in effect pending studies being made of several methods available for treatment. When defendant began operating in January, 1963, before the formulation of permanent standards, his procedure under the county sanitary code (art. Ill, § 2[c]) was either to obtain a permit or to construct a system conforming to the standards set by the Commissioner. Paris knew of the “ unofficial ”, or temporary standards, but chose instead to apply for a permit. The plant for waste treatment which he presented was approved by the health department, but Paris nevertheless proceeded to open and operate without installation of the facility already approved or any other (resembling that which he knew would be acceptable without prior approval).
Defendant’s actions in proceeding under and then abandoning available standards or permits are notably destructive of his claim here of an absence of any standards. These did exist and he did know of them and of alternative procedures. That such standards or administrative guidelines as did exist early in 1963 were later modified, based upon the continued accumulation of scientific data in the field of detergent waste treatment and degradation, is not so much a condemnation of changing standards as an acknowledgment of the rapid strides made through concentrated research and development. Moreover, in taking issue with the then existing standards (or lack of them) defendant is reading the sanitary code as allowing the Commissioner only the power to approve standards generally. But the Commissioner may issue a permit based on submitted plans of whatever nature. The department made known to the defendant its approach when it approved the plans he submitted, to say nothing of his making known to it his procedure under the code alternatives. The court cannot find a requirement that such standards as existed be strictly official standards, especially inasmuch as this entire area is one of broad administrative discretion.
New laundromats have been required to install some sort of approved and effective waste treatment facility, but those in operation when plaintiff determined to insure county-wide, basically uniform treatment were given additional time to comply with these standards. Shortages in the available supply of effective equipment, the expense of the equipment itself, and the fact of pre-existing operation contributed to this extension of time within which to meet the regulations promulgated. Even now these pre-established businesses are being formally and *450 informally activated to compliance. Paris, in objecting to being the first operator the object of proceedings for injunctive relief, is understandably dismayed, but if this argument is available to him it is available to the next and the next ad infinitum. The only avoidance of such position would be for the plaintiff to cast about for a volunteer, and to state that proposition is to visualize its impossibility.
Both on the law and the evidence plaintiff has sustained his cause of action. The court finds the defenses raised to be of no avail. The present and continuing pollution of water by untreated waste discharge from his laundromat by defendant is enjoined, and he shall be restrained from the operation thereof effective 60 days from the entry of judgment herein. Defendant shall have leave to apply for a permit for a treatment facility, or to install such in accordance with plaintiff’s standards, and following the actual installation, inspection, and operation of same may resume operations as a laundromat by application to this court for such relief. No costs.